**FILED**
**OCTOBER 13, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | |
| | ) | No. 32118-5-III |
| JOHN H. MARCUM, | ) | |
| | ) | |
| Petitioner. | ) | PUBLISHED OPINION |

KORSMO, J. — This sexually violent predator (SVP) proceeding presents a matter of statutory interpretation—from what benchmark must a trial judge consider whether a detainee has demonstrated improvement due to treatment in order to obtain an evidentiary trial for release?  We conclude that the legislature has directed trial courts to measure change from the last proceeding rather than from the original commitment.

## FACTS

John Marcum, by stipulation, was committed as a sexually violent predator in January, 2001.  He made progress in treatment at the secure commitment center (SCC) on McNeil Island until the point in 2008 that the staff recommended he be transferred to less restrictive alternative (LRA) status.  The trial court granted the transfer to LRA status in early 2009.  Mr. Marcum moved to the nearby secure community transition facility (SCTF) in the hope that he would transition to unconditional release.

It appeared, however, that Mr. Marcum did not desire that goal. Unimpressed with the wages offered, he declined to work or even to awaken on a regular morning schedule.[1] Although he continued with his sexual deviancy treatment, he made no progress toward transitioning, committed minor rules violations, and blamed the SCTF for his problems. The institution allowed him two years to try to find his way before terminating him from the LRA treatment program. The court revoked his LRA status on March 10, 2011, and returned him to his original SCC program. There he declined to renew his participation in deviancy treatment.

In 2012, he stipulated to his continued SVP status as part of his annual review. He did, however, obtain his own expert evaluation in anticipation of his next annual review. His expert ultimately agreed with Mr. Marcum's personal view that he had benefited significantly from his previous treatment and should be a candidate for release. An evaluator for the State agreed that he had made progress and was suitable for LRA placement rather than total confinement.

Marcum petitioned in August 2013 for a trial on whether he continued to meet the definition of a sexually violent predator. He sought unconditional release rather than another LRA and admitted that he had not engaged in treatment since the revocation of the LRA. The trial court denied the request, ruling that Mr. Marcum was not entitled to

---

[1] He stopped taking medication for depression.

2

an evidentiary trial since he had not made any progress after the LRA revocation and was not then actively participating in treatment.

Mr. Marcum timely appealed to this court.

## ANALYSIS

The question presented is whether the trial judge should have measured the improvement in Mr. Marcum's condition from the time he first entered the SCC or from the time the court last considered his condition at the time his LRA was revoked. We conclude that the legislature has specified that this change should be measured from the last time that the court considered the detainee's condition.

A sexually violent predator is someone "who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). Once a person has been committed as an SVP, the State is required to conduct an annual review to determine whether the person remains an SVP. RCW 71.09.070. A person found to be an SVP has two ways to obtain release from the commitment. One method is for the State to authorize a detainee to file a petition for either unconditional release or transfer to an LRA. RCW 71.09.090(1). The basis for this petition is that the detainee has "so changed" that he either no longer meets the definition of SVP or that an LRA is in the best interest of the detainee. *Id.*

3

The second method is that the detainee may petition, on the basis that he has "so changed" that he no longer fits the SVP definition or that an LRA is in his best interest, for unconditional release or transfer to LRA without the agreement of the State. RCW 71.09.090(2)(a). Under this method, a show cause hearing is held to determine whether an evidentiary trial shall be held. *Id.* Using the annual report, the State bears the burden of establishing by prima facie evidence that the detainee remains an SVP and that transfer to an LRA is not in the best interest of the detainee and conditions cannot be imposed that would protect society. RCW 71.09.090(2)(b). If the State fails to meet these burdens, an evidentiary trial is required. RCW 71.09.090(2)(c)(i).

However, if the State presents a prima facie case, the detainee can still obtain an evidentiary trial if probable cause exists to believe the detainee is no longer an SVP or that an LRA is in the detainee's best interest and the public can be adequately protected. RCW 71.09.090(2)(c)(ii). Whether or not the detainee has "so changed" is defined by statute:

> Probable cause exists to believe that a person's condition has "so changed," under subsection (2) of this section, only when evidence exists, since the person's last commitment trial, or less restrictive alternative revocation proceeding, of a substantial change in the person's physical or mental condition such that the person either no longer meets the definition of a sexually violent predator or that a conditional release to a less

restrictive alternative is in the person's best interest and conditions can be imposed to adequately protect the community.

RCW 71.09.090(4)(a).[2] The underscored language, which presents the primary issue for this appeal, was added by Laws of 2009, ch. 409, § 8.

This statute directs the trial court to measure "change" from the last time it had to assess the person's condition—whether at a commitment hearing or a subsequent LRA revocation. The legislature clearly had that view in mind when, in 2005, it included the "person's last commitment trial" language in the "so changed" probable cause definition. *See* Laws of 2005, ch. 344, § 2.[3] The use of the word "last" conclusively shows that the court was to solely measure change from the most recent court proceeding.

The 2009 amendment, adding the LRA revocation proceeding as an additional proceeding from which change is measured, is consistent with the 2005 amendment. A court is not required to go back to the beginning when there has been a more recent assessment—whether at a commitment trial or an LRA revocation—from which to measure the person's progress. In effect, these changes codify a "law of the case" type of approach to these matters. What a court has decided on one occasion is not subject to

---

[2] The reference to subsection (2) refers to RCW 71.09.090(2), the provision setting out the procedure for a detainee to petition for unconditional release or transfer to LRA status.

[3] *See* FINAL B. REP. ON S.B. 5582, at 1, 59th Leg., Reg. Sess. (Wash. 2005) (noting that the amendment "requires a showing that, since the person's last commitment proceeding," there has been a "substantial change" in the offender (emphasis added)).

reconsideration at the next hearing absent evidence of intervening change resulting from treatment.

The Washington Supreme Court reviewed the "change" element when it considered various aspects of the 2005 amendments to this statute. "Requiring change as a prerequisite for an evidentiary hearing—a statutory requirement that pre-dated the 2005 amendments—does not offend substantive due process principles." *State v. McCuistion*, 174 Wn.2d 369, 384, 275 P.3d 1092 (2012). Once a person has been found to be an SVP, the legislature can, without offending due process principles, properly require the SVP to establish that he has changed sufficiently *due to treatment* to obtain a trial. *Id.* at 384-85. His due process rights against undue confinement are satisfied by the requirement that the State establish his SVP status annually. *Id.* at 386. The right of an SVP to initiate a trial is a statutory right, not a constitutionally required one. *Id.* Accordingly, the legislature can define what is required to obtain this additional benefit.[4] *Id.*

The argument that change should be measured from the original commitment hearing effectively reads the LRA language (and probably the word "last" from the commitment trial language) out of the statute in derogation of our duty to give effect to all language found in legislation. *In re Det. of Stout*, 159 Wn.2d 357, 367 n.6, 150 P.3d

---

[4] "The legislature had every right to alter a scheme that provides protections beyond what is required by substantive due process to ensure committed persons do not abuse the system to receive full annual evidentiary hearings every year based solely upon a change to a single demographic factor." *McQuistion*, 174 Wn.2d at 388-89.

86 (2007). This is the case because any LRA revocation is always going to be later in time to the original (or most recent) commitment trial. The legislature easily could have tied the LRA and commitment trial language to subsequent proceedings of the same variety, but did not. Instead, it tied that language to the "so changed" probable cause definition applicable to both proceedings. As noted earlier, this is entirely consistent with the 2005 legislative intent requiring change be measured from the most recent hearing rather than over the entire history of the commitment.

The legislative choice is reasonable and avoids waste of resources. Mr. Marcum's reading results in a perpetual entitlement to an evidentiary trial every year once sufficient change to justify the first request has been shown. It also reduces the incentive to participate in additional training once a detainee has progressed sufficiently to justify a trial. Perhaps the second or third or fourth jury will find sufficient that which previous juries rejected.

Mr. Marcum had the chance in 2008 to seek a trial, but opted instead to go with an LRA rather than release. Having failed at the LRA, he does not now obtain a "do over" by using the same initial evidence of change to obtain a new commitment trial. He made his choice then and wisely sought the halfway step toward release. The unsuccessful LRA does not demonstrate that Mr. Marcum now is ready for release.

The 2009 amendment did not create an ambiguity or show legislative intent to alter the obligations of the trial judge. The legislature has expressed quite clearly that an

7

SVP who desires to initiate a hearing on the basis that his condition has improved through treatment must show that he has made significant improvement since the last time a court formally looked at the case other than at the annual show cause hearing. That was the intent of the legislature in 2005 and the addition of the LRA language in 2009 did not alter that intent or create an ambiguity. The 2009 amendment simply recognized that an LRA revocation might be the most recent occasion at which a court was assessing the detainee and allowed judges to work from that point.

As in many endeavors, change wrought by treatment is incremental. It might not take much change to push an SVP from one side of the continuum to the other.[5] There is nothing wrong in directing that a judge measure change from the last time the judge did so. All the measurements ultimately involve the same end point—whether the detainee no longer is an SVP due to treatment. RCW 71.09.090(4)(a). This simplifies the judge's workload and creates an incentive for the SVP to continue with treatment.

This is a classic case of improvement to a point, and then a failure to progress. Because of that failure to show progress since the LRA was revoked, and the refusal

---

[5] Thus, a detainee's improvement since the original commitment is always going to be considered in the sense that it helps determine whether or not the detainee remains an SVP or is ready for an LRA. The trial judge simply does not have to go back to the beginning and reweigh evidence anew, but merely looks to see what has changed since the last review, taking the detainee's status at the last review as a given.

No. 32118-5-III
*In re Det. of Marcum*

thereafter to participate in treatment, the trial court correctly determined that Mr. Marcum

was not entitled to a new commitment trial.  There was no error.

Affirmed.

_____
Korsmo, J.

I CONCUR:

_____
Brown, A.C.J.

9

No. 32118-5-III

FEARING, J. (dissenting) — John Marcum's appeal addresses the circumstances under which one confined as a sexually violent predator may gain a trial on the question of whether he should be unconditionally released from confinement. We review two discrete statutory provisions covering those circumstances.

RCW 71.09.090(4)(a) requires one confined as a sexually violent person to show a substantial change in his mental condition "since the person's last commitment trial, or less restrictive alternative revocation proceeding" in order to gain an evidentiary trial toward release from civil commitment. This appeal asks whether John Marcum, a commitment detainee, is entitled to an evidentiary hearing when he shows change since his initial commitment but not since revocation of his less restrictive alternative placement. This question entails a detailed and deft analysis of RCW 71.09.090 and the sexually violent predator act as a whole.

RCW 71.09.090(4)(b)(ii) demands that one confined as a sexually violent person establish a "positive response to continuing participation in treatment" in order to receive an evidentiary hearing toward release from civil commitment. This appeal also asks whether John Marcum is entitled to the evidentiary hearing when he engaged in treatment

for many years, but then refused treatment because he believed he had benefited to the extent possible by past treatment and an expert confirms that belief.

The State of Washington answers both questions in the negative and seeks to deny John Marcum an evidentiary hearing on his request for unconditional release. I answer both questions in the affirmative because numerous canons of statutory construction compel this answer. These principles include reading a statute in harmony with other provisions of the same act, reviewing a statute's history including amendments, avoiding unreasonable results in the application of the statute, and eluding unconstitutional consequences following from the statute. The State's reading of RCW 71.09.090(4) could impound a cured sexually violent predator for the remainder of his life, an unconstitutional and unreasonable outcome. The predator's dreadful acts may merit a lifetime of confinement, but the law justifiably restrains us from exacting continuous retribution.

I conclude that the court measures the detainee's change in condition from the last restrictive alternative placement revocation only when the detainee again seeks an alternative placement. The court should measure change from the last commitment trial if the detainee seeks unconditional release. I conclude that the detainee need not show continuing participation in treatment through the date of his release hearing as long as he shows a positive response to earlier continuing treatment. These conclusions are the only reasonable and constitutional readings of RCW 71.09.090(4). I would grant John

2

Marcum a trial on the question of whether he should remain confined and remand to the superior court for such a trial.

The highest of governmental values—public safety and individual liberty—clash in the setting of Washington's sexually violent predator statutes. On the one hand, the State wishes to prevent rapes, child molestations, and other horrific and violent acts. No State official wishes the release to the public of one convicted of sexual violence with the result that the released detainee terrorizes, assaults, and permanently harms yet another victim. On the other hand, America is the land of the free, and prized constitutional protections of liberty demand that one unlikely to commit a violent sexual crime not be confined by the government. No state official wishes to encage an individual independent of his or her past history beyond the time demanded by his or her crimes and the time needed to treat the individual for violent predilections.

## FACTS

The facts in a sexually violent predator confinement case typically begin with the detainee's unearthly criminal history. John Marcum is now fifty years old. In 1988, John Marcum took indecent liberties with one young boy and molested another. In 1993 and 1994, Marcum molested a third young boy. Marcum was in his twenties when he committed the three crimes. Marcum later admitted to sexual contact with eighteen other underage victims.

Psychologists diagnosed John Marcum with pedophilia, personality disorder with

narcissistic and passive aggressive traits, and alcohol abuse and dependence. Pedophilia is a sexual attraction to and preference for children. A personality disorder is a pervasive and inflexible pattern of interacting with the world that causes impairment in a social or occupational setting. A personality disorder leads to one persistently hurting others or oneself. Narcissism entails a limited outlook or concern for one's own activities or needs. Passive aggressive behavior involves expression of negative feelings, resentment, and aggression in an unassertive passive way, as through procrastination and stubbornness.

In January 2001, John Marcum stipulated, under chapter 71.09 RCW, to civil commitment as a sexually violent predator. The Department of Social and Health Services (DSHS) detained John Marcum at its Secure Commitment Center (SCC) complex on South Puget Sound's McNeil Island, where Marcum engaged in sexual deviancy treatment.

While confined to SCC's total confinement facility, John Marcum unfailingly participated in treatment. Annual reviews for 2002 to 2008 described Marcum as progressing in managing his sexual deviancy. On July 14, 2008, the SCC's senior clinical team recommended that Marcum be transferred to a less restrictive alternative at the Pierce County Secure Community Transition Facility (SCTF) also within the McNeil Island SCC complex. "Transition" refers to the goal of transitioning to unconditional release. On January 30, 2009, the trial court reassigned Marcum to the SCTF.

4

John Marcum floundered during his SCTF placement. Marcum's community transition team instructed him to rise at a reasonable hour in the morning, exercise, and work at the facility. Marcum refused. He rejected work at the SCTF because the facility paid a wage less than minimum wage and the facility would deduct a portion of the wages for the cost of his care. Residents of the SCC only receive $1 to $3 per hour for work performed while in the sexual deviancy program.

While confined in the SCTF, John Marcum, after expending his savings, traded stamps for cigarettes in violation of facility rules. In a thinking exercise report, Marcum faulted the SCTF for his poor transitioning to a less restrictive facility. Marcum's behavioral problems stemmed from failure to take antidepressant medications.

On February 13, 2011 and as a result of John Marcum's intransigence, SCTF's Dr. Vincent Gollogly terminated Marcum's sexual deviancy treatment. Gollogly wrote: "I do not believe I can help him any further, due to his attitude, frustration and irritability regarding his transitional programming at the SCTF." Clerk's Papers (CP) at 122-23. Despite his lack of cooperation with regard to nontreatment behavior, Marcum continued to participate in treatment at the SCTF.

On March 10, 2011, the State petitioned the trial court to revoke Marcum's less restrictive alternative placement. The trial court granted the State's motion, and Marcum returned to the total confinement treatment center within the SCC complex. Marcum thereafter refused further treatment.

DSHS must annually review the mental health condition of a resident at the SCC and determine whether continued confinement is warranted. John Marcum stipulated to continued confinement in 2012. Nevertheless, Marcum's 2012 annual review noted that, since arriving at the SCC, he successfully developed tactics learned in treatment to manage his "deviant arousal, substance abuse, and the cycle that had led to his sexual offending." CP at 45. The review declared that Marcum had gained maximum benefit from inpatient treatment. Upon the annual review, the trial court concluded, nonetheless, that DSHS's 2012 annual report provided prima facie evidence that Marcum's condition continued to meet the statutory definition of a sexually violent predator and a less restrictive alternative placement was not appropriate. The 2012 agreed order on annual review also read: "[Marcum] did not present his own evidence at this time, but entry of this order does not prevent him from obtaining such evidence in the future or from petitioning the court, at any time, for conditional or unconditional release." CP at 14. In December 2012, in preparation for his next annual review, Marcum obtained such evidence.

On December 13, 2012, Dr. Paul Spizman evaluated and prepared a thorough report concerning John Marcum. In the report, Dr. Spizman detailed Marcum's progress at the SCC since his 2001 confinement as the result of extensive treatment. The improvement included adjustments in masturbation habits, changes in sexual preferences, avoidance of children during outings, and participation in Alcoholics Anonymous. When

6

Spizman interviewed Marcum, Marcum accepted responsibility for failure during his SCTF less restrictive placement.

Paul Spizman penned, in his December 2012 evaluation, that John Marcum reported no struggles with thoughts or fantasies of children since 2003. Dr. Spizman wrote about Marcum's pedophilia:

> Mr. Marcum has made notable gains in learning to control his sexual orientation toward children, via his efforts in treatment. This has been demonstrated not only in his report, but also in physiological testing. Thus, I am identifying this disorder as existing in his history, but this is not a current diagnosis for him.

CP at 58. According to Spizman, physiological tests showed Marcum was no longer sexually attracted to children and thus Marcum should no longer be diagnosed with pedophilia. Marcum also no longer suffered from a personality disorder, according to Spizman.

In December 2012, Paul Spizman calculated Marcum's risk of reoffending by using an actuarial assessment tool, and he estimated the risk of Marcum engaging in a predatory act of sexual violence within the next ten years at 18.2 to 29.6 percent. Spizman concluded:

> As such, it is my professional opinion that Mr. Marcum has so changed, via his efforts in treatment, in conjunction with various other factors, that he no longer meets the definition of a Sexually Violent Predator.

CP at 74.

On April 15, 2013, on behalf of DSHS, Regina Harrington completed John

Marcum's annual confinement review. Dr. Harrington noted that, from February 2012

through March 2013, Marcum rejected sexual offender treatment. Harrington wrote:

"Though not involved in formal treatment activities, Mr. Marcum continued to verbalize

benefit from sexual offender treatment already completed, as he did previously, noting a

variety of day to day decisions reflecting treatment knowledge and interventions." CP at

21. Harrington opined that Marcum's failure in his less restrictive alternative placement

was "based on circumstances not related to concern or deterioration in sexual regulation."

CP at 17.

Dr. Regina Harrington wrote concerning John Marcum:

Despite the challenge, adversity and disappointment from more
recent experiences when living at the SCTF and subsequent revocation,
overall Mr. Marcum has not seemed to regress to a less functional manner
of coping. Though challenged by resentment and bitterness, he still
verbalizes commitment to treatment principles. His mood has apparently
remained stable and his overall his sense of well being seems somewhat
improved. Though it seems he did not consistently apply constructive or
optimal strategies for his deteriorating attitude while at the SCTF, presently
he seemingly is maintaining constructive conduct and self-regulation.
Presently, Mr. Marcum is not taking the opportunity to engage in treatment
discussion about his actions, listen to criticism, acknowledge his faults and
make appropriate changes so he can become a better person. On the other
hand, he is not demonstrating an overall deterioration of attitude,
perspective and self-regulation. He has continued to demonstrate long-term
sobriety, albeit largely in a controlled setting, but nevertheless while having
access to controlled substances. In the community he was proactive in
taking steps to ensure he obtained community support for maintaining his
sobriety but his ability to manage this risk independently with increased
access to substances does remain untested. Most important, he is

describing sexual functioning similar to what he reported prior to and while at the SCTF when collateral treatment observations and polygraphs all suggested constructive sexual regulation without sexually deviant urges.

CP at 23.

Regina Harrington continued:

It continues to be the opinion of this evaluator Mr. Marcum has reached maximum benefit from inpatient treatment and a higher management setting is not in his best interest as it does not further his adaption to community life and does not appear necessary for community safety based on what is observed of his current functioning and functioning while at the SCTF on conditional release. Further, if he were to continue to do well and demonstrated sustained success with sexual self-management while living independently under a conditional release, it could be possible he would not meet statutory criteria as a sexually violent predator. Thus, in the opinion of this evaluator, it would be preferable to facilitate a conditional release optimizing opportunity for independent living with supervision and treatment to support risk management and likelihood of a successful community transition for Mr. Marcum.

CP at 23.

Despite John Marcum's earlier refusal to work, Regina Harrington noted in her 2013 review:

Nevertheless, Mr. Marcum appears to function well in other life domains afforded by institutional life. He consistently meets institutional standards for residential life and maintains employment in a more selective job. Work evaluations continue to describe him as a dependable worker with a good attitude, who is always on time and gives notice if he needs time off, who knows his job and pays attention to details, who is always cooperative with supervisors, takes direction and criticism well, who will take charge if asked, who is respectful to staff and peers in area and overall is "among the best." . . . After return from the SCTF in 2011, he earned back level 4 privileges, the highest for non treatment residents, which he maintains. In February he was moved to the residential unit for residents

with the lowest management/supervision needs. There have been no formal behavioral violations affecting level privileges or other negative behavioral reports.

CP at 20.

Dr. Harrington wrote:

Using the actuarial tool STATIC99R, static (unchanging) risk factors in Mr. Marcum's sexual offense history and background presently generate a score of 4 which places him in a moderately high risk category for sexual reoffense relative to a very large group sample of sexual offenders. Group reoffense rates for a subsample selected as higher risk offenders who have this score, were approximately 30% over ten years and actuarial reoffense estimates are generally considered underestimates of actual sexual offense risk over a lifetime, in part because of unreported or unprosecuted offenses, because research base rates represent time limited estimates often just based on convictions, and because this tool only incorporates some of the primary risk factors for reoffense in its formula. However, important to note, actuarial calculations periodically decline in accordance with an observed statistical decline in sexual offending for aging offenders with a large decline observed in the group with oldest offenders, from 60 years and beyond.

CP at 17.

Dr. Harrington concluded:

It is my professional opinion Mr. Marcum continues to meet the definition of a sexually violent predator because his present mental condition still includes the predisposition for sexually violent behavior which renders him more likely than not to sexually re-offend if he were unconditionally released to the community without continued treatment and supervision. However, it is my professional opinion he continues to [be] suitable for a less restrictive alternative community placement and a higher management total confinement setting is not in his best interest and is not needed for community safety.

CP at 24.

John Marcum seeks release to live with his family in Wisconsin. Family members know of Marcum's prior molestation of children and insist they will monitor him. Nevertheless, children, ages 10 and 12, would live next door.

PROCEDURE

On August 7, 2013, John Marcum petitioned, pursuant to RCW 71.09.090, for a trial on whether he continued to meet the statutory definition of a sexually violent predator. Marcum did not seek release to a less restrictive alternative, but only requested unconditional release from confinement. Marcum relied solely on the evaluation by Paul Spizman.

At a show cause hearing, John Marcum contended that he substantially changed since his 2001 confinement and his change was to be measured beginning with that confinement. Marcum maintained that denial of a trial would unconstitutionally detain him since he had undergone all treatment courses that the SCC offered and he had gained maximum benefits. Marcum also contended that, despite his refusal to participate in treatment during the last two years, the State could not preclude his release because he internalized prior treatment.

The State resisted John Marcum's unconditional release. The State argued that RCW 71.09.090 requires that Marcum show a substantial change in his condition since the trial court revoked the less restrictive alternative placement in 2011. The State additionally argued that Marcum could not show the requirement of "continuing

11

participation" under RCW 71.09.090(4)(b)(ii).

The trial court accepted the State's position as to whether change is measured from John Marcum's date of commitment in 2001 or the revocation of his placement at the SCTF in 2011. The trial court ruled that the State had met its burden that John Marcum remained a sexually violent predator and Marcum failed to fulfill his burden to present evidence of a change since the revocation of the less restrictive alternative placement. Thus, the trial court denied Marcum an evidentiary trial. The lower court entered findings of fact, which included:

> 3. [Marcum] continues to suffer from Pedophilia.
> 4. [Marcum] has not engaged in treatment for over two years.
> 5. [Marcum's] mental condition has not changed since he was determined to have a mental abnormality and/or personality disorder which renders him likely to engage in predatory acts of sexual violence if not confined.
> 6. [Marcum's] condition has not changed in this review period such that it would be in his best interest or the interest of community safety to release him to a less restrictive alternative.

CP at 76-77.

## LAW AND ANALYSIS

This court must interpret RCW 71.09.090 subsection (4)(a) to assess when the measurement of substantial change in the detainee's mental health condition begins and subsection (4)(b)(ii) for what constitutes a "positive response to continuing participation" in treatment. I first review the background to the statute and Washington's civil commitment scheme for sexually violent predators to assist in interpreting the two

statutory provisions. Later I focus on the two statutory provisions in RCW 71.09.090(4) in question and apply canons of statutory interpretation.

*Chapter 71.09 RCW – Sexually Violent Predators*

Washington's Legislature adopted the community protection act of 1990 in response to citizens' concerns that state law failed to protect communities from sexually violent offenders. *See* GOVERNOR'S TASK FORCE ON CMTY. PROT., DEP'T OF SOC. & HEALTH SERVS., FINAL REPORT I–1 (1989). Washington's act was the first in the nation addressing sexually violent offenders. The act contained sweeping changes in the law concerning sex offenders. The impetus for the act was the murder of a Seattle woman by a sexual offender on work release and the violent sexual attack on a young Tacoma boy. GOVERNOR'S TASK FORCE ON CMTY. PROT. at I-1. During the drafting of the act, Westley Allan Dodd kidnapped, raped, and murdered three young boys in Vancouver.

The community protection act contains fourteen sections dealing with such topics as registration of sex offenders, crime victims' compensation, background checks, reduction in good time credits, and increased penalties for sex offenders. LAWS OF 1990, ch. 3, §§ 1001-1013, codified at RCW 71.09, is entitled "Civil Commitment" and is the part of the act we address on this appeal. A legislative finding supporting the disclosure of information regarding sex offenders by public agencies to the public reads:

> The legislature finds that sex offenders pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is a paramount

13

governmental interest.

LAWS OF 1990, ch. 3, § 116; *see* RCW 4.24.550.

To protect the public, the State may constitutionally confine dangerous individuals who suffer from mental illnesses or disorders even if the mental condition is untreatable. *Kansas v. Hendricks*, 521 U.S. 346, 390, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997); *In re Det. of Gaff*, 90 Wn. App. 834, 845, 954 P.2d 943 (1998). Therefore, RCW 71.09.060 authorizes the State of Washington to involuntarily commit a person determined to be a "sexually violent predator" after he or she serves a sentence for a crime. The previous involuntary confinement system managed only short term treatment of persons with serious mental disorders, with the intent of quickly returning the confined persons to the community. The legislature enacted extensive findings concerning the need to involuntarily commit violent sexual offenders for long term treatment. Among those findings, the legislature declared:

> In contrast to persons appropriate for civil commitment under chapter 71.05 RCW, sexually violent predators generally have antisocial personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. . . . The legislature further finds that the prognosis for curing sexually violent offenders is poor, the treatment needs of this population are very long term, and the treatment modalities for this population are very different than the traditional treatment modalities.

Former RCW 71.09.010 (1990).

14

The Washington Supreme Court has upheld the sexually violent predator civil commitment scheme against a substantive due process challenge based on the legislature's honest recognition of the difficulties inherent in treating those afflicted with the mental abnormalities causing the sex predator condition. *In re Pers. Restraint of Young*, 122 Wn.2d 1, 31, 857 P.2d 989 (1993). The commitment proceeding focuses not on the criminal culpability of past actions but on treating sexually violent persons for a current abnormality and protecting society from the sexually violent acts associated with that abnormality. *Young*, 122 Wn.2d at 21.

A "sexually violent predator" is someone "convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence." RCW 71.09.020(18). The term "personality disorder" is defined as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment." RCW 71.09.020(9). The community protection act defines the term "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts." RCW 71.09.020(8). "Predatory" acts are those directed at strangers or individuals groomed by the offender for the purpose of victimization. RCW 71.09.020(10).

15

When a person's sentence for a sexually violent offense has expired or is about to expire, the State may file a petition alleging the person to be a sexually violent predator. RCW 71.09.025; .030. When the petition is filed, a judge must determine ex parte if "probable cause exists to believe that the person named in the petition is a sexually violent predator." RCW 71.09.040. If the court finds probable cause, DSHS assumes custody of the person and transfers him or her to a facility for evaluation. Within forty-five days, the trial court must conduct a trial to determine if the person is a sexually violent predator. RCW 71.09.050. Either party, or the court, may demand a jury trial. The burden is on the State to prove, beyond a reasonable doubt, that the detainee is a sexually violent predator. RCW 71.09.060(1). If so, he or she is remanded to DSHS custody and committed to a facility "for control, care, and treatment" until safe to be at large. RCW 71.09.060(1). The statute limits treatment centers to mental health facilities located within correctional institutions. RCW 71.09.060(3); RCW 10.77.220. To date, DSHS has confined sexually violent predators at the Special Commitment Center on McNeil Island.

If DSHS determines that the detainee's mental condition has changed such that conditional release to a less restrictive alternative is in the best interest of the person and the conditions imposed protect the community, DSHS may transfer the detainee to a less restrictive alternative placement, on approval by the trial court. RCW 71.09.090(1); .092. The detainee may, on his or her own initiative, seek relocation to the less restrictive

16

alternative. RCW 71.09.090(2)(a). The trial court may revoke placement in a less restrictive alternative if the detainee violates conditions of the conditional release or needs additional care, monitoring, treatment, or supervision. RCW 71.09.098.

Because a civil commitment is indefinite, the due process requirement that a detainee be mentally ill and dangerous is ongoing. *In re Det. of Moore*, 167 Wn.2d 113, 125 n.3, 216 P.3d 1015 (2009); *In re Det. of Mitchell*, 160 Wn. App. 669, 677, 249 P.3d 662 (2011). Stated differently, a detainee has a constitutional right to liberty if he or she no longer poses a substantial danger to the public. *Foucha v. Louisiana*, 504 U.S. 71, 77, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). Therefore, under Washington law, any detainee must be examined annually to determine his or her mental condition and whether he or she continues to meet the standard for commitment. RCW 71.09.070; *In re Det. of Ambers*, 160 Wn.2d 543, 548, 158 P.3d 1144 (2007). DSHS must provide the results of the examination to the trial court that conducted the original commitment hearing, the detainee, and the prosecuting attorney. RCW 71.09.070; *Ambers*, 160 Wn.2d at 548. In addition, the detainee may obtain an additional examination at state expense. RCW 71.09.070.

If DSHS determines that a detainee is no longer mentally ill or dangerous, the secretary must authorize him to petition for release. RCW 71.09.090(1); *Ambers*, 160 Wn.2d at 548. A detainee may also petition the court directly without the approval of DSHS. RCW 71.09.090(2)(a). Upon filing such a petition, a show cause hearing is held,

17

at which time the petitioning detainee has the right to be represented by appointed counsel, but not the right to be present. RCW 71.09.090(2)(b). The purpose of the show cause hearing is to assess whether a full evidentiary trial is necessary to justify continued civil commitment. *In re Det. of Reimer*, 146 Wn. App. 179, 188, 190 P.3d 74 (2008). This appeal concerns whether John Marcum is entitled to a full evidentiary hearing.

The standard of proof at the show cause hearing is "probable cause." RCW 71.09.090(2), (4)(a); *State v. McCuistion*, 174 Wn.2d 369, 382, 275 P.3d 1092 (2012), *cert. denied*, 133 S. Ct. 1460 (2013). Under the probable cause standard, a court must assume the truth of the evidence presented by the detainee. *McCuistion*, 174 Wn.2d at 382. The trial court may not weigh and measure asserted facts against potentially competing ones. *McCuistion*, 174 Wn.2d at 382. The trial court must determine whether the asserted evidence, if believed, is sufficient to establish the proposition its proponent intends to prove. *McCuistion*, 174 Wn.2d at 382. This appeals court reviews de novo whether evidence meets the probable cause standard. *Ambers*, 160 Wn.2d at 557. Thus, the show cause hearing parallels a summary judgment motion hearing in civil suits.

The State of Washington bears the initial burden at the show cause hearing to show probable cause that the detainee continues to meet the statutory definition of a sexually violent predator. RCW 71.09.090(2)(b)-(d). If the State does not present this prima facie evidence, probable cause exists to believe that continued confinement is not warranted and the matter must be scheduled for a full evidentiary hearing at trial. *In re*

*Det. of Reimer*, 146 Wn. App. at 188 (2008). If the State satisfies its burden, a new trial

may still be ordered if the detainee's proof establishes probable cause that his or her

condition has substantially changed such that the person no longer meets the definition of

a sexually violent predator. RCW 71.09.090(2)(c)(ii); *Reimer*, 146 Wn. App. at 188.

The trial court measures change either from the date of the last commitment trial or the

last less restrictive alternative revocation proceeding. RCW 71.09.090(4)(a). This appeal

asks, in part, from what date is change measured when the detainee seeks unconditional

release because he no longer meets the definition of a sexually violent predator. The

detainee must show he had a "positive response to continuing participation in treatment."

RCW 71.09.090(4)(b)(ii). This appeal also questions whether the detainee must engage

in treatment through the time of his petition for release.

If the court, during the show cause hearing, finds probable cause that the detainee

is no longer dangerous, the trial court must convene a full evidentiary hearing. RCW

71.09.090(2)(c). Either party may demand a jury trial for the full hearing. RCW

71.09.090(1). At the evidentiary trial, the State must prove that the detainee continues to

meet the sexually violent person definition beyond a reasonable doubt. RCW

71.09.090(3)(a), (c); *Ambers*, 160 Wn.2d at 548-49; *In re Det. of Cherry*, 166 Wn. App.

70, 76, 271 P.3d 259 (2012).

The law recognizes that the State cannot reduce all risk of repeat sexually violent

behavior before releasing a sexually violent person. One may not remain confined

because he or she poses some risk to the community. *In re Det. of Ambers*, 160 Wn.2d at 551-52 (2007). Research concludes that sexually violent predilections cannot be cured but must be managed over a lifetime. Motivated offenders can learn through treatment and supervision to identify, change and manage their offending behaviors, identify and control the internal stimuli and external circumstances which promote these offenses, and thereby decrease their risk of offending.

## *Findings of Fact*

The trial court in this appeal entered six findings of fact, four to which John Marcum assigns error. Since the trial court does not weigh the evidence at a show cause hearing, I consider the findings superfluous and do not rely on the findings.

Again, the show cause hearing is in the nature of a summary judgment motion hearing. A trial court does not enter findings of fact in response to a summary judgment motion. *Oltman v. Holland Am. Line USA, Inc.*, 163 Wn.2d 236, 249 n.10, 178 P.3d 981 (2008); *Hemenway v. Miller*, 116 Wn.2d 725, 731, 807 P.2d 863 (1991); *Chelan County Deputy Sheriffs' Ass'n v. County of Chelan*, 109 Wn.2d 282, 294 n.6, 745 P.2d 1 (1987). The sexually violent predator statute, chapter 71.09 RCW, is civil in nature, and the summary judgment civil rule can apply to a confinement proceeding. *In re Det. of Cherry*, 166 Wn. App. at 74 (2011). Marcum understandably and cautiously assigned errors to some of the findings, but an assignment was not necessary.

20

*RCW 71.09.090(4)(a) – Measurement of Change*

I return to the first of the two specific issues on appeal. To gain an evidentiary hearing on whether he may be released from civil commitment, a sexually violent person must show probable cause at a preliminary hearing. The controlling statute, RCW 71.09.090(4)(a), describes "probable cause" in this setting as:

> (a) Probable cause exists to believe that a person's condition has "so changed," under subsection (2) of this section, *only when evidence exists, since the person's last commitment trial, or less restrictive alternative revocation proceeding, of a substantial change in the person's physical or mental condition* such that the person either no longer meets the definition of a sexually violent predator or that a conditional release to a less restrictive alternative is in the person's best interest and conditions can be imposed to adequately protect the community.

(Emphasis added.)

The critical language in RCW 71.09.090(4)(a) declares: "only when evidence exists, since the person's last commitment trial, *or* less restrictive alternative revocation proceeding, of a substantial change in the person's physical or mental condition." (Emphasis added). The phrases "last commitment trial" and "less restrictive alternative revocation proceeding" are in the disjunctive. Presumably the adjective "last" modifies both "commitment trial" and "less restrictive alternative revocation proceeding."

An ambiguity appears in the critical language of RCW 71.09.090. In order to gain an evidentiary hearing on his petition for unconditional release, the sexually violent predator must show a substantial change, but from what date? The statute gives two

21

options, either the date of the last commitment trial or the date of the proceeding to revoke a less restrictive alternative placement. I assume that, if the sexually violent person can show change from the date of a revocation hearing, he can show a change since the last commitment trial. As the last commitment trial was likely further in the past, a detainee will usually wish to measure change from the trial because the longer expanse of time will necessarily encompass more change.

John Marcum argues that Dr. Paul Spizman's evaluation presents prima facie evidence that Marcum changed through treatment since his civil commitment trial in 2001, satisfying RCW 71.09.090(4). The State argues RCW 71.09.090(4)(a) requires Marcum show a change in his condition following the less restrictive alternative revocation in 2011. Marcum admits he cannot show substantial change since the revocation.

I must interpret a statute in such a way as to give effect to all language used, rendering no part superfluous. *In re Det. of Ambers*, 160 Wn.2d at 552 (2007); *State v. Young*, 125 Wn.2d 688, 696, 888 P.2d 142 (1995). Thus, I may not hold that the detainee may always choose the last commitment trial as the inauguration date for change. I must give meaning to the language "or less restrictive alternative revocation proceeding." The revocation of a less restrictive alternative placement must in some instances be the date from which a court measures change.

I give the phrase "or less restrictive alternative revocation proceeding" effect by

concluding that the beginning date for change is the revocation proceeding when the detainee petitions for another less restrictive alternative placement. Otherwise, if the detainee seeks unconditional release, the trial court should measure change beginning with the last commitment trial. Since John Marcum seeks unconditional release, the trial court erred and should have measured change since 2001.

I review the meaning of a statute de novo, as an issue of law. *State v. Johnson*, 132 Wn. App. 400, 406, 132 P.3d 737 (2006). The court's duty in statutory interpretation is to discern and implement the legislature's intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). When the plain language of a statute is unambiguous and legislative intent is apparent, we will not construe the statute otherwise. *Lowy*, 174 Wn.2d at 779. Plain meaning may be gleaned from all that the legislature has said in the statute and related statutes which disclose legislative intent about the provision in question. *Lowy*, 174 Wn.2d at 779; *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002).

I consider three principles of statutory construction dispositive. First, in construing statutes, the court may examine the provision at issue, other provisions of the same act, and related statutes. *In re Bankr. Petition of Wieber*, 182 Wn.2d 919, 925, 347 P.3d 41 (2015); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d at 10-12. I may examine the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole. *Lake v. Woodcreek Homeowners Ass'n,*

23

169 Wn.2d 516, 526, 243 P.3d 1283 (2010); *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). Second, because civil commitment statutes involve a deprivation of liberty, they should be construed strictly. *In re Det. of Swanson*, 115 Wn.2d 21, 27, 804 P.2d 1 (1990); *In re Det. of C.W.*, 147 Wn.2d 259, 272, 53 P.3d 979 (2002). Third, if a statute's interpretation may render it unconstitutional, courts should adopt, if possible, a construction upholding its constitutionality. *In re Det. of Ambers*, 160 Wn.2d at 553, n.4 (2007); *C.W.*, 147 Wn.2d at 277. All three principles of construction encourage the adoption of John Marcum's reading of RCW 71.09.090(4)(a). The history behind RCW 71.09.090(4)(a) also advances this conclusion.

Many passages in RCW 71.09.090 distinguish between a petition for unconditional release, on the one hand, and a petition for conditional release or placement in a less restrictive alternative, on the other hand. RCW 71.09.090(1) directs DSHS to authorize a petition by the detainee when "either: (a) The person no longer meets the definition of a sexually violent predator; or (b) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community." RCW 71.09.090(2)(a) allows the detainee to petition, without approval from DSHS, for either unconditional release or release to the alternate placement.

RCW 71.09.090(2)(c) directs the trial court, upon a petition by the detainee, to conduct a show cause hearing as to whether probable cause exists that the person is no

24

longer a sexually violent predator or can be housed in a less restrictive alternative. RCW 71.09.090(3)(c) and (d) create distinct burdens of proof depending on whether the detainee seeks unconditional release or conditional placement. RCW 71.09.090(4)(b) directs the trial court to grant an evidentiary hearing only on testimony from a licensed professional and evidence of a "change in condition since the person's last commitment trial proceeding." Unlike subsection (4)(a), subsection (4)(b) makes no mention of a prior "less restrictive alternative revocation proceeding."

RCW 71.09.090(4)(a)'s distinction between measuring change beginning with the last commitment trial versus the last less restrictive alternative revocation proceeding becomes reasonable if a detainee petitioning for a less restrictive alternative placement must measure change from the last revocation proceeding, whereas a detainee petitioning for unconditional release must measure change from the last commitment trial. A petition for unconditional release serves a different purpose than a petition for a less restrictive alternative placement. Reading RCW 71.09.090(4)(a) as I do allows a comparison between apples and apples and between oranges and oranges, rather than a comparison between apples and oranges. When determining whether the detainee should no longer be confined a court should measure change since before he was confined, or at least since his last commitment trial. His progress since a less restrictive alternative revocation hearing is immaterial in determining whether he can live in the community without endangering others.

Two of this court's decisions emphasize the difference between a conditional release trial and an unconditional release trial: *In re Detention of Jones*, 149 Wn. App. 16, 201 P.3d 1066 (2009) and *In re Detention of Bergen*, 146 Wn. App. 515, 195 P.3d 529 (2008). Unlike in a conditional release trial, the detainee in an unconditional release trial contests his commitment criteria. *Bergen*, 146 Wn. App. at 533. Thus, the detainee's change since commitment should control.

The State's reading of RCW 71.09.090(4)(a) also conflicts with other sections of the community protection act. For example, RCW 71.09.060(1) demands a sexually violent predator be placed in DSHS custody "until such time as . . . the person's condition has so changed that the person no longer meets the definition of a sexually violent predator." This language demands release of a person when he or she is no longer a sexually violent predator, regardless of the lack of change since a less restrictive alternative revocation proceeding.

The State's interpretation of RCW 71.09.090(4)(a) not only fails to distinguish between the two different types of petitions but also could render the statute unconstitutional. The State argues that any change in Marcum's condition must have occurred after his most recent adjudication, whether that was a less restrictive alternative hearing or full sexually violent predator trial. Nevertheless, a previously adjudicated predator could transition to a less restrictive alternative when he or she no longer satisfies the statutory definition of a sexually violent predator. In the alternative, the predator

26

could improve during the less restrictive alternative placement such that he no longer fits the definition. The alternate placement could then be terminated for reasons other than treatment failure. Because of the revocation, this detainee would be unable to show additional improvement since the last revocation proceeding since he had already improved to the point of no longer being a sexually violent predator before any revocation. Because of this anomaly, a detainee may never seek a less restrictive alternative placement since he will be penalized by the placement if he later seeks to gain unconditional release.

Under the hypothetical above, one who is no longer a sexually violent predator remains confined against his will. Thus, the State's elucidation of RCW 71.09.090(4)(a) leads to an unreasonable and unjust end. Courts give statutes a rational, sensible construction. *State v. Thomas*, 121 Wn.2d 504, 512, 851 P.2d 673 (1993); *In re Marriage of Kinnan*, 131 Wn. App. 738, 751, 129 P.3d 807 (2006). Statutes should receive a sensible construction so as to avoid unjust or absurd consequences. *State ex rel. Thorp v. Devin*, 26 Wn.2d 333, 173 P.2d 994 (1946); *Whitehead v. Dep't of Soc. & Health Servs.*, 92 Wn.2d 265, 269, 595 P.2d 926 (1979).

Civil commitment is a massive deprivation of liberty. *State v. McCuistion*, 174 Wn.2d at 387 (2012). The sexually violent predator civil commitment scheme comports with substantive due process because it does not permit continued involuntary commitment of a person who is no longer mentally ill and dangerous. *State v.*

27

*McCuistion*, 174 Wn.2d at 388. If a detainee provides new evidence establishing probable cause that he is not currently a sexually violent predator, due process requires a trial on the merits. *State v. McCuistion*, 174 Wn.2d at 384 (2012); *In re Det. of Ward*, 125 Wn. App. 381, 386, 104 P.3d 747 (2005). Once the original basis for the detainee's commitment no longer exists, continuing confinement would be unconstitutional. *In re Det. of Ambers*, 160 Wn.2d at 553 n.4 (2007). Current dangerousness is a bedrock principle underlying the commitment scheme. *In re Det. of Paschke*, 121 Wn. App. 614, 622, 90 P.3d 74 (2004). The State's reading of chapter 71.09 RCW violates this constitutional imperative. The State may require a change in the sexually violent person but, if the change sufficiently reduces the risk of recidivism, the State may not demand that change occur only during a limited measure of time.

Our hypothetical becomes reality in John Marcum's case. According to Dr. Paul Spizman, John Marcum is no longer a sexually violent predator. Nevertheless, because Marcum sat in the SCFT for two years and then lost his less restrictive alternative privileges, the State seeks to retain custody of him because of a lack of change since the revocation.

Under the State's reading of RCW 71.09.090(4)(a), a detainee may also face a more stringent standard for release at the show cause hearing than is required for release at the initial commitment trial. In a footnote, our state high court has noted the precarious constitutional footing behind a rule that would require a more stringent standard imposed

28

on the sexually violent person from one hearing to the next. *In re Det. of Ambers*, 160 Wn.2d at 553 n.4 (2007).

The history behind the community protection act, in general, and RCW 71.09.090(4)(a), in specific, supports a reading that the trial court measures change from the time of the last less restrictive alternative revocation hearing only when the detainee again seeks a less restrictive alternative placement. The language of the 1990 act that created RCW 71.09.090 allowed the detainee a show cause hearing annually to determine if his "condition has so changed that he or she is safe to be at large." LAWS OF 1990, ch. 3, § 1009(2). The language did not mention the date from which change was measured. Presumably a court gauged change, under the act's original language, from the date of initial confinement. The language did not mention a petition for a less restrictive alternative placement. In 1990, RCW 71.09.090 had only two subsections.

In *In re Personal Restraint of Young*, 122 Wn.2d 1, 857 P.2d 989 (1993), the state Supreme Court held that the basic scheme of the sexually violent predator statute was constitutional. Nevertheless, it agreed with the petitioners that the statute violated equal protection because it did not require consideration of less restrictive alternative placement as a substitute to total confinement as did the mental health statutes, chapter 71.05 RCW. The court held that the jury must consider a less restrictive alternative as an option to total confinement, if the defendant so requests. Although *Young* dealt with an initial placement trial, the reasoning behind the decision applies equally to the annual review of

29

a detainee. Upon the annual review, the detainee has a constitutional right to seek a less restrictive alternative.

In 1995 and in response to *Young*, the Washington Legislature amended the sexually violent predator statute. In addition to addressing other concerns raised by *Young*, amendments to RCW 71.09.090 allowed the confined person to be released to a less restrictive alternative under limited circumstances. The legislature altered RCW 71.09.090 to allow a petition "for conditional release to a less restrictive alternative or unconditional discharge." LAWS OF 1995, ch. 216, § 9. In other words, the legislature amended the act to comply with constitutional demands. The 1995 law also removed the language "safe to be at large" and substituted "safe to be conditionally released to a less restrictive alternative or unconditionally discharged." LAWS OF 1995, ch. 216, § 9. The amendment still did not mention when to begin measuring the change of the detainee's mental condition.

In 2005, the legislature altered RCW 71.09.090 again. The amendment added subsection (4) to the statute. LAWS OF 2005 ch. 344, § 2. Nevertheless, subsection (4) included no mention as to ever measuring change beginning at the last less restrictive alternative revocation proceeding. As of the 2005 amendment, RCW 71.09.090(4) read:

> (a) Probable cause exists to believe that a person's condition has "so changed," under subsection (2) of this section, *only when evidence exists, since the person's last commitment trial proceeding, of a substantial change* in the person's physical or mental condition such that the person either no longer meets the definition of a sexually violent predator or that a

conditional release to a less restrictive alternative is in the person's best interest and conditions can be imposed to adequately protect the community.

(Emphasis added.)

A 2009 amendment inserted the language "or less restrictive alternative revocation proceeding" in front of "of a substantial change" such that the statute contains its present form. LAWS OF 2009 ch. 409, § 8. Since the statute added this language only after the detainee gained the option to seek a less restrictive alternative placement, reason suggests that the inserted language applies to a petition seeking the less restrictive alternative placement. This holds true even though the inserted language appeared in an amendment four years after the detainee gained the option. The 2009 amendment is an awkward and tardy adjustment to modify the 2005 amendment adding the option of a petition for a less restrictive alternative placement.

*RCW 71.09.090(4)(b)(ii) – Positive Response to Continuing Participation in Treatment*

I next address the "positive response to continuing participation" language of RCW 71.09.090(4)(b)(ii). The State argues John Marcum cannot show "continuous participation" under RCW 71.09.090(4)(b)(ii) because Marcum ceased participating in treatment following the 2011 revocation of his least restrictive alternative placement.

RCW 71.09.090(4) declares:

(b) A new trial proceeding under subsection (3) of this section may be ordered, or a trial proceeding may be held, only when there is current evidence from a licensed professional of one of the following *and the*

31

> *evidence presents a change in condition since the person's last commitment trial proceeding:*
>> (i) An identified physiological change to the person, such as paralysis, stroke, or dementia, that renders the committed person unable to commit a sexually violent act and this change is permanent; or
>> (ii) A *change in the person's mental condition brought about through positive response to continuing participation in treatment* which indicates that the person meets the standard for conditional release to a less restrictive alternative or that the person would be safe to be at large if unconditionally released from commitment.

(Emphasis added.) Since John Marcum claims no physiological change, I focus on subsection (b)(ii).

"Continuing" is the key word in subsection (b)(ii), and the lay dictionary defines "continuing" as "continuous, constant." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 493 (1993). Taken literally, the statute could mean the confined person must engage in treatment twenty-four hours a day, three hundred sixty-five days a year from the date of commitment until the final day of trial on his petition for release. Nevertheless, courts interpret the statute reasonably and without absurd consequences. Courts give statutes a rational, sensible construction. *State v. Thomas*, 121 Wn.2d at 512 (1993).

The statute may impliedly demand treatment through the date of petitioning for release. But such a demand is not express. In reading the statute as a whole, I interpret the statute to require continuing treatment to the extent that the detainee no longer fits within the definition of a "sexually violent predator." I need not and do not decide any

32

minimum time needed for treatment.

I reach my interpretation, in part, because another interpretation could lead to the unconstitutionality of the statute. Were "continuous participation" interpreted to require no break in treatment, a break would prevent the release of someone who is no longer a sexually violent predator. Again, civil commitment is a massive deprivation of liberty. *State v. McCuistion*, 174 Wn.2d at 387 (2012). An individual subject to a civil commitment is entitled to release on a showing that he is no longer mentally ill or dangerous. *Foucha v. Louisiana*, 504 U.S. at 77-78 (1992); *State v. McCuistion*, 174 Wn.2d at 385 (2012). The State may require continuous treatment until the sexually violent person no longer presents a danger, but the State may not demand unlimited and unending treatment.

In *In re Detention of Ambers*, 160 Wn.2d at 557 (2007), the high court considered the test to be "whether Ambers met his burden of demonstrating that his condition has so changed due to a continuing course of treatment." The Supreme Court did not state that Kevin Ambers needed to prove treatment was continuing up until the date he petitioned for a less restrictive alternative placement or up until the date of trial. The court held that Ambers met his burden because a licensed psychologist opined that Ambers change of mental condition was brought about through positive responses to continuing participation in treatment that indicated he no longer meets the criteria of a sexually violent predator.

33

The Washington Legislature anticipates that the confined person will engage in long-term, not short-lived, treatment, based on the legislature's belief that a sexually violent person's illness is chronic. In passing its 2005 amendments to the community protection act, the legislature declared: "the mental abnormalities and personality disorders that make a person subject to commitment under chapter 71.09 RCW are severe and chronic and do not remit due solely to advancing age or changes in other demographic factors." LAWS OF 2005, ch. 344, § 1. The legislature also stated that persons committed as sexually violent predators "generally require prolonged treatment in a secure facility followed by intensive community supervision in the cases where positive treatment gains are sufficient for community safety." LAWS OF 2005, ch. 344, § 1. To the extent that untreated individuals present a significant risk of reoffending, the State has an interest in protecting public safety by restricting evidentiary hearings to those who have participated in treatment. *State v. McCuistion*, 174 Wn.2d at 395 (2012). Nevertheless, the law does not impose a specific minimum time for treatment. Nor does science establish a minimum time needed for treatment.

John Marcum underwent treatment for eleven years. His expert opines that, as a result of extensive participation in treatment, he no longer meets the criteria for being a sexually violent predator.

RCW 71.09.090(4)(b)(ii) requires a "positive response to continuing participation in treatment," rather than simply "continuing participation in treatment." The State's

argument ignores the language preceding "continuous participation." The entire language could be read to focus on the response to treatment rather than the amount of treatment. Once the detainee positively responds to continuing treatment, it is immaterial whether treatment continues. The purpose of the community protection act is to promote treatment based change, not to demand unending treatment. Because the legislature may constitutionally demand treatment of a sexually violent person as a means of addressing an underlying mental condition, change in that condition is more important than the length of treatment.

### *Evidentiary Trial*

Courts review de novo whether evidence presented at a show cause hearing meets the probable cause standard. *In re Det. of Ambers*, 160 Wn.2d at 557 (2007); *In re Det. of Petersen*, 145 Wn.2d 789, 799, 42 P.3d 952 (2002). Therefore, despite being a member of a reviewing court, I may decide whether John Marcum satisfied the requirements for a full evidentiary hearing. In *In re Detention of Elmore*, 162 Wn.2d 27, 39, 168 P.3d 1285 (2007), our high court reversed the trial court's denial of a full evidentiary hearing and remanded for the evidentiary hearing rather than another show cause hearing.

During my earlier review of the sexually violent predator statutes, I examined the burdens of proof that each side holds at a show cause hearing. The State must present some evidence that the detainee still meets the definition of a sexually violent predator.

35

If the State meets its burden, the detainee must present facts which, if believed, warrant further proceedings. *In re Det. of Petersen*, 145 Wn.2d at 798-99. RCW 71.09.090(4)(b)(ii) requires a showing by a licensed professional that the petitioner's condition has changed due to a positive response to a continuing course of treatment, such that he no longer meets the initial commitment criteria. *In re Det. of Ambers*, 160 Wn.2d at 557.

A trial court may not weigh the evidence in determining whether probable cause exists. *In re Det. of Elmore*, 162 Wn.2d at 37 (2007). A trial standard of proof has no application to probable cause determinations. *In re Det. of Petersen*, 145 Wn.2d at 797. If the court determines that probable cause exists, the court must set a full hearing under RCW 71.09.090(3), at which the parties may present all the evidence and the fact finder may weigh the evidence and resolve any disputes. *Elmore*, 162 Wn.2d at 37. I would not free John Marcum from civil commitment, but allow him a trial on the question of whether the State must release him.

John Marcum argues that the State failed to establish a prima facie case that his mental condition makes him likely to reoffend. Marcum claims that the State's expert, Regina Harrington, opined that Marcum has only a thirty percent recidivism risk. In reply, the State contends that Dr. Harrington relied on dynamic factors to conclude that Marcum would likely engage in predatory acts if released. Typically a court addresses whether the State establishes a prima facie case, before determining whether the detainee

36

presents sufficient evidence. RCW 71.09.090(2)(b)-(d); *In re Det. of Reimer*, 146 Wn. App. at 188 (2008). I see no need to follow this order of proof in this appeal, since Marcum readily satisfies his burden.

The State of Washington wishes this court to accept Regina Harrington's opinions, rather than Paul Spizman's opinions. Nevertheless, this court commits error by trusting one expert's conclusions over another's conclusions. *In re Det. of Elmore*, 162 Wn.2d at 37 (2007). The court may not weigh the credibility of an expert opinion. *In re Det. of Jacobson*, 120 Wn. App. 770, 781, 86 P.3d 1202 (2004). On remand, at the time of the evidentiary trial, the trier of fact need not believe Dr. Spizman's testimony over Dr. Harrington's. Nonetheless, John Marcum has presented sufficient evidence of change following his last commitment trial to warrant a full evidentiary hearing on whether he continues to meet the statutory definition of a sexually violent predator. I note that the State has used Paul Spizman as its expert witness in the past. *In re Det. of Bergen*, 146 Wn. App. 515, 522, 195 P.3d 529 (2008).

The State impliedly claims that Paul Spizman's opinions are conclusory in nature. Conclusory statements cannot establish probable cause, so a court must look beyond an expert's stated conclusions to determine if they are supported by sufficient facts. *In re Det. of Jacobson*, 120 Wn. App. at 780. I find Spizman's conclusions to be specific, based upon a thorough review of John Marcum's background, and meticulously buttressed in a lengthy report. Some of Spizman's findings are supported by the State's

37

own evidence, as the 2012 annual review declared that Marcum had gained maximum benefit from inpatient treatment.

I would reverse the trial court's denial of John Marcum's show cause motion. I would remand to the trial court for an evidentiary hearing, pursuant to RCW 71.09.090, on the question of Marcum's continued confinement as a sexually violent predator. Therefore, I respectfully dissent.

_____
Fearing, J.